UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:21-CR-352 (JEB) |
| v. | : | |
| | : | |
| MARC BRU, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO TRANSFER VENUE

Defendant Marc Bru, who is charged in connection with events at the U.S. Capitol on January 6, 2021, and proceeding *pro se*, has moved to transfer venue in this case to the Eastern District of Washington. *See* ECF No. 73 ("Def.'s Mot."). Bru fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and thus the Court should deny his motion, just as it has denied many similar motions seeking venue transfer in other January 6-related cases.[1]

---

[1] In the two and a half years that have passed since the first January 6-related arrests, dozens upon dozens of defendants have filed motions seeking to transfer or change venue. None have been granted. Indeed, 20 judges on this Court have considered such motions, and all 20 have denied them. *See, e.g., United States v. Maxwell*, 22-cr-99, Minute Entry (D.D.C. June 15, 2023) (RJL); *United States v. Wren*, Minute Entry (D.D.C. April 11, 2023) (RBW); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-12, ECF No. 114 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-687, ECF No. 78 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, ECF No. 52 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, ECF No. 62 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Ballenger*, No. 21-719, ECF. No. 75 (D.D.C. Oct. 28, 2022) (JEB); *United States v. Eicher*, No. 22-cr-38, ECF No.

**BACKGROUND**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Based on his actions on January 6, 2021, Bru was charged with the following seven offenses: entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); entering or remaining in a gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count 3); disorderly conduct in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4); parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 5); civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 6); and obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 7)

Bru now moves to transfer venue to the Eastern District of Washington, where he lives. Def.'s Mot. He contends that prejudice should be presumed in this District Court based on: (1) the political makeup of the Washington, D.C. jury pool; (2) the amount of negative pretrial publicity

---

34 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. Apr. 29, 2022) (TNM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL).

surrounding the events of January 6; (3) the "repercussions" of the events at the U.S. Capitol on January 6 on the people who live and/or work at its "epicenter" in Washington, D.C.; and (4) that despite the two and a half years that has passed since the events of January 6, negative media coverage remains prominent. *See* Def.'s Mot. All of the defendant's arguments are meritless. The Court should deny his motion accordingly.

## **LEGAL STANDARD**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (*en banc*) (*per curiam*). And, after *voir dire*, "it may be found that, despite

earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during *voir dire*. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half-century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United*

4

*States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (*per curiam*) (unpublished) (September 11, 2001 attacks, including on the Pentagon); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although the *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). Indeed, the bulk of Bru's motion is structured around the first three *Skilling* factors, arguing that they support transferring his case to the Eastern District of Washington.[2] *See generally* Def.'s Mot. Bru is

---

[2] Because Bru has not yet gone to trial, the fourth and final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," 561 U.S. at 383—plainly does not directly apply and Bru does not contort himself to argue that it does, *see* Def.'s Mot. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where

5

wrong; the *Skilling* factors do not support a presumption of prejudice in this case.

## ARGUMENT

Bru contends that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont) and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view that an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id*.

### I.  The Political Makeup of Washington, D.C. Does Not Support a Presumption of Prejudice.

Bru first contends that he cannot obtain a fair trial in the District of Columbia because over 92 percent of District of Columbia residents voted for the Democratic Party candidate in the 2020 Presidential Election. Def.'s Mot. at 4-5. The *en banc* D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the

---

the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting *voir dire*.

Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that the authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with Bru's apparent political beliefs. But whether individual prospective jurors have such disqualifying biases can be assessed during *voir dire*. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election fraud trial that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The voting record of Washington, D.C. residents does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d

7

at 70.

To the contrary, as the nation's capital and seat of the federal government, Washington, D.C. has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried here. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (*per curiam*); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most Washington, D.C. residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

**II.     The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

Next, Bru argues that prejudice should be presumed based on voluminous and persistent negative pretrial publicity. Def.'s Mot. at 5-9. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for

jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

Neither the volume nor the tone/content of pre-trial media coverage supports a venue transfer. Both *Skilling* and *Haldeman* involved intense, voluminous pre-trial media coverage of the defendants, and in both cases the district courts denied motions to transfer venue. In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61. The D.C. Circuit concluded that the *Haldeman* coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Bru specifically. And, again, statements by the President are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

Contrary to Bru's argument that he cannot receive a fair trial in Washington, D.C. because of the volume, tone, and content of news coverage of January 6, *see* Def.'s Mot. at 5-9, even "massive" news coverage of a crime does not require prejudice to be presumed, *Haldeman*, 559

9

F.2d at 61. Moreover, unlike the coverage at issue in *Skilling* and *Haldeman*, a comparatively minuscule percentage of the news coverage of January 6 has focused on Bru. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1,100 people. Moreover, Bru is not among the most seriously charged or the most notorious. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful *voir dire* and properly instructing the jury about the need to determine a defendant's individual guilt.

In any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Neither the nature of the pretrial publicity in this case nor the volume supports a presumption of prejudice.

### III. The Impact of January 6 on Washington D.C. Residents Does Not Support a Presumption of Prejudice.

Bru also asserts that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6 and the subsequent media coverage, including by having their "daily lives . . . significantly interrupted for several months." Def.'s Mot. at 9. But January 6 is now more than two and a half years in the past. Many D.C. residents do not

live or work near the Capitol where the roads were closed and the National Guard was deployed. There is no reason to believe that Washington, D.C.'s entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14 (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *Yousef*, 327 F.3d 56 (1993 World Trade Center bombing); *Moussaoui*, 43 F. App'x 612 (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the *voir dire* process was "well suited to that task." *Id.* In this case too, *voir dire* can adequately identify those D.C. residents who were so affected by January 6 and its aftermath that they cannot impartially serve as jurors. There is no reason to presume every potential juror is prejudiced, or that the Court and the parties cannot identify those who are prejudiced via targeted questioning.

### IV. The Length of Time—32 Months—that Has Passed Since January 6, 2021 Does Not Support a Presumption of Prejudice.

Finally, Bru argues that although over 30 months have passed since the riot at the Capitol on January 6, 2021, the ongoing media coverage and "recent charges brought against President Trump" place the events "in the forefront of the attention of the American people . . . particularly those who are in the Washington, D.C. area" and thus support a presumption of prejudice. Def.'s Mot. at 9-10. This is not so.

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's

11

bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 32 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, only a relatively tiny percentage of the recent stories have mentioned Bru and much of the reporting has been national in scope, rather than limited to Washington, D.C. Indeed, the large amount of time that has passed since January 6, 2021, further supports *keeping* the case in this District, not transferring it, as Bru suggests.

## CONCLUSION

For the foregoing reasons, Bru's motion to transfer venue, ECF No. 73, should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney, Detailee
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33602
(813) 274-6370
michael.gordon3@usdoj.gov

*/s/ Madison H. Mumma*
MADISON H. MUMMA
Trial Attorney, Detailee
North Carolina State Bar No. 56546
601 D St., NW
Washington, D.C. 20530
(202) 431-8603
madison.mumma2@usdoj.gov